(No. 73394.—

SHEILA ROACH *et al.*, Appellants, v. SPRINGFIELD CLINIC *et al.*, Appellees.

*Opinion filed September 23, 1993.—Rehearing denied November 29, 1993.*

MILLER, C.J., took no part.

Alexandra de Saint Phalle, Craig A. Randle and Thomas F. Londrigan, of Londrigan, Potter & Randle, P.C., of Springfield, for appellants.

Heyl, Royster, Voelker & Allen, of Peoria (Gary M. Peplow and Karen L. Kendall, of counsel), and Adrian E. Harless, of Springfield, for appellees Springfield Clinic and Michael Zinzilieta.

Paul Bown and Denise Druhot, of Brown, Hay & Stephens, of Springfield, for appellee Memorial Medical Center.

James E. Neville and Karen E. Mason, of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, for appellees Springfield Clinic and E. Michael Bradley.

John T. Bomher and Mark D. Deaton, of Naperville, for *amicus curiae* Illinois Hospital Association.

Bruce Robert Pfaff, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE HARRISON delivered the opinion of the court:

Sheila and Timothy Roach, as parents and next friends of their minor daughter, Kayla, brought a medical malpractice action in the circuit court of Sangamon County to recover damages after Kayla was born with cerebral palsy and irreversible brain damage. Named as defendants were Memorial Medical Center (Memorial), the hospital where Mrs. Roach gave birth to Kayla; E. Michael Bradley, M.D., and his partner, Michael Zinzilieta, M.D., Mrs. Roach's obstetricians; and Springfield Clinic (Clinic), the facility from which Bradley and Zinzilieta conducted their obstetrics practice. Following a jury trial, a verdict was returned in favor of each of these defendants. The circuit court entered judgment on that verdict, and the appellate court affirmed (223 Ill. App. 3d 597). We then granted the Roaches' petition for leave to appeal. (134 Ill. 2d R. 315.) The primary issue now before us is whether the circuit court properly excluded certain evidence at trial on the grounds that it was privileged and inadmissible under sections 8—2101 and 8—2102 of the Code of Civil Procedure (735 ILCS 5/8—2101, 8—2102 (West 1992)). For the reasons which follow, we hold that the disputed evidence was erroneously excluded and that the Roaches are entitled to a

new trial on their claims against Memorial. The judgments in favor of the remaining defendants shall be affirmed.

The record before us shows that Sheila Roach became pregnant with Kayla in 1986 and sought obstetrical care from Doctors Bradley and Zinzilieta at the Clinic. Mrs. Roach was expected to give birth around December 31, 1986, but had still not delivered by January 5, 1987. When Dr. Bradley examined her in his office on that date, he advised her that, if she did not deliver in the next five days, she should undergo a "nonstress test" at Memorial to help assess the fetus' status.

On the morning of January 10, Mrs. Roach submitted to the test. It was "nonreactive," indicating the need for additional testing. Dr. Kintner, a first-year hospital resident, then performed a sonogram and gave Mrs. Roach a vaginal examination. Dr. Bradley subsequently performed his own examination, concluding that there was a potential for fetal distress and that delivery should proceed. Accordingly, he ordered that Mrs. Roach be admitted to the hospital and given Pitocin, a hormone preparation used to induce labor. He also alerted the hospital staff to the potential for fetal distress and the possible need for an emergency cesarean section (C-section). Bradley then left the hospital.

At 6 p.m. Bradley spoke with Kintner, who advised him that Mrs. Roach was continuing to have contractions. Kintner also reported intermittent periods of increased and decreased fetal heartbeats, but advised that there were no signs of fetal distress. Bradley decided that the Pitocin should be continued until 8 p.m., when it would be stopped so that Mrs. Roach could eat and rest for the night.

Thirty minutes after the Pitocin was discontinued, Dr. Kintner telephoned Bradley to advise him that Mrs. Roach was still having contractions, that her cervix had

not changed significantly, and that there were still no signs of fetal distress. Monitoring of the fetal heartbeats was suspended for the remainder of the night. During that period, Dr. Bradley was not informed of any problems, nor was he advised of any problems the next morning, when the Pitocin injections were resumed. Bradley's involvement with the treatment ended at 8 a.m. on January 11, when his partner, Dr. Zinzilieta, took over the management of Mrs. Roach's care.

Dr. Zinzilieta reviewed the fetal monitor strips from the previous day, performed a vaginal examination on Mrs. Roach, and consulted the previous doctors' and nurses' notes. During the course of the vaginal exam, Dr. Zinzilieta felt an irregular structure at the cervix. He ruled out the possibility that this was caused by the umbilical cord, but admitted that he recognized the potential for a prolapsed cord (a situation in which the umbilical cord drops below the baby's head into the birth canal and cuts off all oxygen to the baby as it comes through the vagina). He also performed a sonogram, which ruled out a hand or breech presentation.

Based on the foregoing, Dr. Zinzilieta concurred in Bradley's judgment that there was no fetal distress and that the proper course was to continue attempting to induce labor using Pitocin. According to Zinzilieta, there were no indications that a cesarean section was necessary. Zinzilieta testified, however, that he informed Memorial of the potential for an emergency C-section if increased fetal distress were noted or if a prolapsed cord became evident. Dr. Zinzilieta also stated that he personally instructed Memorial nurses to prepare for a C-section and to alert the anesthesia department in the event that it were needed in an emergency situation. He then left Memorial to begin his rounds at another hospital.

At 11:30 a.m. the baby's heart rate dropped suddenly and precipitously, falling from 140 beats per minute to

50 beats per minute within a three-minute time span. According to Dr. Putnam, the resident on duty, a heart rate of 60 to 70 beats per minute could cause brain damage within 10 minutes. Putnam was summoned to the scene at 11:33, and arrived two minutes later. Dr. Zinzilieta was paged immediately, and an attempt was made to contact the anesthesia department and the anesthesiologist, Dr. Gotanco.

The baby's last audible heartbeat was heard at 11:37 a.m. At 11:38, Dr. Putnam took Mrs. Roach to the operating room. Dr. Zinzilieta arrived six minutes later, at 11:44 a.m. Although preparations for a C-section were in progress, Gotanco and the nurse anesthetist, Mike Funk, were still not there. Believing he could delay no longer, Dr. Zinzilieta decided to proceed with the operation using only a local anesthetic. He began cutting through Mrs. Roach's abdominal wall at 11:47 a.m. Three minutes into the procedure, Gotanco and Funk finally arrived to administer the general anesthesia. At 11:51 a.m., Dr. Zinzilieta was able to remove Kayla from the womb, but found the umbilical cord wrapped so tightly around her neck that it had to be severed rather than unwrapped. Dr. Kozak, Kayla's pediatrician, testified that Kayla was not breathing, had no heart tone, and was "next to being dead." Resuscitation efforts were commenced immediately, but five minutes passed before a heart rate of 20 to 30 beats per minute could be attained. A normal heart rate was not reached until Kayla was 10 minutes of age. She now suffers from cerebral palsy and irreversible brain damage.

Plaintiffs subsequently filed this medical malpractice action in February of 1988. The case, as ultimately submitted to the jury, sought recovery from Drs. Bradley and Zinzilieta and their employer, the Clinic, on the grounds that those doctors were negligent for continuing to administer Pitocin for as long as they did and in not

performing the C-section sooner. Plaintiffs also sought recovery from Memorial, alleging that the hospital's nursing staff had failed to properly monitor Sheila Roach's progress during the early morning hours prior to her delivery. More importantly, plaintiffs claimed that Memorial should be found negligent for having failed to make general anesthesia available for Mrs. Roach's emergency C-section on a timely basis.

In an attempt to establish that the hospital was guilty of an unreasonable delay in providing the necessary anesthesia, plaintiffs called as witnesses Mike Funk, the nurse anesthetist, and Dr. Gotanco, the anesthesiologist. Although hospital records indicated that the nursing staff had called for anesthesia as early as 11:35 on the morning in question, Funk testified that he was sitting in the anesthesia workroom reading the newspaper and heard nothing until 11:47 a.m., when he was first notified to appear in the operating room. Until that time he had received no warning that Mrs. Roach might need a C-section. Gotanco, who was serving as the "first-call" anesthesiologist at Memorial that morning, had a similar experience. He testified that when he reported for duty, no one advised him that he should prepare for a C-section on Mrs. Roach. He was, in fact, told nothing about the situation until he was paged in the call room at approximately 11:48 a.m. As our previous discussion has indicated, both he and Funk were able to respond immediately once they received notification that they were needed.

Funk stated that he did not know the reason for the delay, but indicated that he had discussed the matter with Dr. Draper, Memorial's chief of anesthesiology. When Funk was asked about that discussion, Memorial objected. Out of the jury's presence, Funk related that Dr. Draper had stopped him in the hall at Memorial two or three days after Kayla's birth and asked "if he had a

moment to spare." Draper then volunteered that the delay had occurred because there were "some, either one or two, new secretaries down in the OB department" and that they did not know the proper or most effective way of paging the anesthesia team.

The trial court sustained Memorial's objection and refused to allow Funk to repeat this testimony to the jury. The basis for its ruling was that Draper's conversation with Funk was inadmissible under section 8—2102 of the Code of Civil Procedure (735 ILCS 5/8—2102 (West 1992)) because it was privileged under section 8—2101 of the Code (735 ILCS 5/8—2101 (West 1992)).

That statute provides:

> "All information, interviews, reports, statements, memoranda or other data of *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges, except that in any hospital proceeding to decide upon a physician's staff privileges, or in any judicial review thereof, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based." 735 ILCS 5/8—2101 (West 1992).

The appellate court subsequently affirmed the circuit court's determination, reasoning that the evidence in question was privileged because the explanation Draper had shared with Funk constituted "information *** of" the medical staff of an "accredited hospital" that was " 'used in the course of internal quality control *** for

the purpose of \*\*\* improving patient care' " as those terms are used in the statute. (223 Ill. App. 3d at 607, quoting 735 ILCS 5/8—2101 (West 1992).) The factual basis for this holding was the deposition of Dr. Draper, which had been submitted to the circuit court in connection with a pretrial discovery motion filed by plaintiffs. That motion sought to compel disclosure of certain information by Draper and to obtain sanctions against Memorial for having wrongfully claimed in its answers to interrogatories that it did not know why there had been a delay in providing the necessary anesthesia services to Mrs. Roach.

During Draper's deposition, his attorney directed him not to answer many of the questions he was asked regarding the discussions he had had with Memorial's medical staff following Kayla's birth. The picture we have of the situation is therefore far from complete. It appears, however, that the sole source of information for the admission Funk claims Draper made was Phyllis Dentinger, a nursing supervisor in Memorial's obstetrics department. Draper testified that he probably spoke with Dentinger two or three times in the 7- to 10-day period after Kayla was born. His recollection was that no one else was present during these discussions, and he did not believe that he spoke to any other nursing staff members or administrators at Memorial regarding the delay in contacting anesthesia for Mrs. Roach's C-section.

In his deposition, Draper explained that his job as chairman of the anesthesia department is

> "to provide good quality service of anesthesia and coordinate services between departments. Any time there are any questions as to delivery of services, it's part of my job to make sure that they are taken care of in an effective manner, to investigate any problems if there are any, and if there are problems, to correct them."

With respect to his conversations with Dentinger, Draper stated that his specific purpose had been "[t]o determine if there was a problem, and if there was a problem, to help find ways to improve things; quality control." He did not speak to her concerning any obstetricians.

Following the conversations, and after reviewing reports submitted to him by Funk and Gotanco, Draper "made a report to the Department of Anesthesia meeting." No showing was made as to how, if at all, that report drew on what Draper had learned from Dentinger. Indeed, Draper was not permitted by his attorney to reveal anything about the substance of his report.

The Roaches now argue, as they have throughout this proceeding, that these facts will not support a finding of statutory privilege. We agree. The appellate court's analysis was premised on the proposition that the privilege encompasses any information obtained from an accredited hospital's medical staff and used for the purposes set forth in the statute. That is not so. What the law actually protects is not information of a hospital's medical staff, but information of *committees* of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees ***." (Emphasis added.) (735 ILCS 5/8—2101 (West 1992).) As House Minority Leader Lee Daniels explained when language referring to "medical staffs" was first inserted into the statute in 1981:

> "Daniels: Mr. Speaker, Ladies and Gentlemen of the House, House Bill 1365 amends the Medical Studies Act to include medical staffs of hospitals among the data generating entities whose reports are protected by confidentiality. ***
>
> * * *
>
> Stearney: Okay, well the Amendment seems to do

more than what you've said now. It not only, it gives them not only confidentiality which they had, it says that all information is privileged. True?

Daniels: In those *committees*, that is correct.

\* \* \*

Daniels: In this case, what we're talking about is a confidentiality in medical peer review groups so that we can protect the people within that group, not withhold evidence, not withhold evidence that could come out in a trial but only to encourage the quality of the review of those peer review people so that we don't have any problem in dealing with the doctors that review themselves." (Emphasis added.) 82d Ill. Gen. Assem., House Proceedings, May 17, 1981, at 80-83.

Consistent with this discussion, this court has previously recognized that the law's purpose is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care. The statute is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues. *Richter v. Diamond* (1985), 108 Ill. 2d 265, 269; *Jenkins v. Wu* (1984), 102 Ill. 2d 468, 480.

In this case, there is no dispute that Draper's discussions with Dentinger had nothing to do with any physician peer-review committee. Although the statute may be applicable to certain other types of committees (see *Niven v. Siqueira* (1985), 109 Ill. 2d 357), the foregoing authorities suggest that where the committee is one comprised of the hospital's medical staff, the committee must be involved in the peer-review process before the privilege will attach. Whether the statute should be so construed need not be definitively resolved by us now, however, for here nurse Dentinger's statements to Draper and Draper's remarks to Funk were not "information of" *any* committee, peer-review or otherwise. As

our prior review of the facts indicated, the only "committee" mentioned in the record was Memorial's department of anesthesiology, and Draper's conversations with Dentinger and Funk took place before the monthly meeting at which the department was apprised of the delay in providing Mrs. Roach with adequate anesthesia.

The information obtained by Draper from Dentinger in the course of his conversations was not transformed into "information of" the anesthesiology department merely because Draper reported the incident to that body sometime later. As a preliminary matter, we observe that Memorial made no showing that what Draper learned from Dentinger was, in fact, ever conveyed to the department. All Draper was allowed to say at his deposition was that his report to the department followed his conversations with Dentinger and his review of reports from Funk and Gotanco. He testified that he summarized Funk's and Gotanco's reports in his presentation to that body, but he said nothing about the information he acquired from Dentinger. The responsibility for not making a more complete record on this point must be placed squarely on Memorial, not plaintiffs, for the burden of establishing the applicability of an evidentiary privilege rests with the party who seeks to invoke it. *Ekstrom v. Temple* (1990), 197 Ill. App. 3d 120, 127.

Even without this problem, our conclusion would remain unchanged. If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually contained in a patient's records. As a result, it would be substantially more difficult for patients to hold hospitals responsible for their wrongdoing through medical malpractice litigation. So protected, those institutions would have scant

incentive for advancing the goal of improved patient care. The purpose of the act would be completely subverted.

Our appellate court has correctly observed that the statute was never intended to shield hospitals from potential liability. (*Marsh v. Lake Forest Hospital* (1988), 166 Ill. App. 3d 70, 76.) Memorial does not question this proposition, but attempts to reason around it by suggesting that what Draper told Funk following his conversations with Dentinger was really privileged only because it constituted the "conclusions" of Draper's investigation. According to Memorial, plaintiffs remained fully free to obtain information about the underlying facts. What Memorial's theory fails to acknowledge is that the statute does not extend any special treatment to "conclusions." Under the express terms of the statute, the privilege, where it exists, extends to "[a]ll information, interviews, reports, statements, memoranda or other data." 735 ILCS 5/8—2101 (West 1992).

Memorial's theory also fails because it presupposes that Draper's investigation was tantamount to an investigation by "a committee," itself. The term "committee" is never specifically defined in the statute, so we must give it its ordinary and popularly understood meaning. (*Union Electric Co. v. Department of Revenue* (1990), 136 Ill. 2d 385, 397.) As generally understood, a "committee" is comprised of a body or group of persons, not just a single individual. (See Webster's Third New International Dictionary 458 (1986); American Heritage Dictionary 298 (2d college ed. 1985).) As we have just discussed, the only "committee" here was the anesthesia department, and Draper spoke with Dentinger and Funk before that department was even made aware of the problem.

We have not found, and Memorial has not cited, any legal principle which would warrant imputing Draper's

actions here to the department simply because he served as its chairman. Under Memorial's bylaws, the chairman was ultimately accountable for "all professional and administrative activities within his department," but it was the department, as a body, which was charged with responsibility for conducting medical reviews at the monthly meetings. The bylaws contained no provision conferring on the chairman, or on any individual, the authority to act for the department in conducting interviews or investigations preliminary to the review process.

Because the statutory privilege was inapplicable to Funk's testimony about his conversation with Draper, that testimony should not have been kept from the jury. Although Funk and Gotanco were allowed to testify that they were not notified at the times indicated in Mrs. Roach's medical records, there was no other evidence that the delay may have been attributable to mistakes by Memorial's staff. The Roaches' counsel was left to argue inferences. Because the issue of negligent delay was central to the Roaches' case against Memorial, "we cannot say with confidence that the admission of [the excluded evidence] would not have affected the jury's verdict." (*Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 217.) Accordingly, the Roaches are entitled to a new trial on their claims against the hospital. In light of this conclusion we need not reach the Roaches' additional arguments that a new trial is warranted against Memorial (1) as a sanction against Memorial for having submitted false answers to interrogatories, (2) because the circuit court erred in refusing to permit them to present certain deposition testimony given by nurse Dentinger in an earlier and unrelated case, or (3) because the circuit court erroneously rejected one of their tendered jury instructions.

Although we reverse and remand for a new trial as to Memorial, we affirm the appellate court's judgment affirming the judgment of the circuit court in favor of the remaining defendants, Zinzilieta, Bradley, and the Clinic. The Roaches raise but two arguments which relate to their claims against these defendants. The first is that the circuit court erroneously instructed the jury during their lawyer's closing argument that statements taken from learned treatises may be used for purposes of impeachment, but are not substantive evidence. The Roaches do not contend that this instruction misstates the law. Rather, they urge us to change the law and to adopt Federal Rule of Evidence 803(18), which provides that learned treatises are not excluded by the hearsay rule under certain specified conditions.

This argument is not properly before us. The contested instruction was given during closing argument as the Roaches' attorney was recalling an exchange he had had during the trial with Dr. Michael Gast, one of defendants' experts. During that exchange, counsel had begun discussing questions he had put to Gast regarding some journal articles when defense counsel objected that the Roaches' lawyer was arguing as if the articles were substantive evidence. When the court gave the Roaches' lawyer an opportunity to respond, she stated unequivocally that she was "not arguing that the treatise is substantive evidence." She then continued, stating that when she had referred Gast to

"this book, this Creasey book about the fact that you can have fetal distress, fetal, [*sic*] without this late decelerations or acute changes and again, he just poohed it off and said, oh, well, that is not in my experience."

At this point defense counsel raised the same objection, and the court *sua sponte* gave the instruction of which the Roaches now complain.

At the time, the court's instruction elicited no comment from the Roaches' lawyer. She merely continued with her closing statement. Nor did she challenge the instruction in her post-trial motion. Indeed, from the record before us, it appears that the matter was raised for the first time in this court. This is hardly surprising. From the context of the exchange set forth above, it appears that she never intended to assert that the material could be considered for any purpose other than impeachment.

In the appellate court, the question of whether learned treatises could be considered as substantive evidence arose in a wholly different context. There, the issue appeared in connection with whether the circuit court had erred in excluding the Roaches' exhibits DD—12 and DD—14. As the appellate court noted, only DD—14 actually involved a treatise. DD—12 was not a text so much as a standard for obstetricians and gynecologists, and its admissibility was analyzed in terms of the rules applicable to industry, trade or regulatory group standards. The learned treatise exception to the hearsay rule was not involved.

Exhibit DD—14 consisted of a photocopy of page 312 of a textbook entitled Maternal Fetal Medicine. It purported to show a sample fetal monitoring strip illustrating the tracings one would record from a nonreactive fetus. Below the tracings was an explanatory note which stated:

> "Figure 7—47. A nonreactive fetus. No fetal movements, virtual absence of FHR variability and accelerations, and suspicious-looking deceleration following the spontaneous uterine contractions in the latter part of the trace."

Although the appellate court did discuss the viability of the learned treatise exception when considering the admissibility of this exhibit, that discussion was unnecessary. In one of their briefs to our court, defendants

charge that the Roaches never actually moved to have DD—14 admitted as substantive evidence. By way of response, the Roaches' reply brief has cited pages 118 and 119 of the July 18, 1991, supplement to the record and pages 34 through 36 of the transcript of the videotaped evidentiary deposition of Dr. Stuart Weiner, one of their experts. Of these materials, however, only the Weiner deposition addresses DD—14.

The trial judge presided over that deposition, which was recorded in the midst of the trial and replayed for the jury. During the course of the deposition, counsel for the Roaches showed Weiner a copy of DD—14 and asked him to confirm that "it is an example of a non-reactive fetus." After Weiner did so, counsel merely asked the court for "leave to *exhibit* to the Jury Plaintiff's Exhibit D D 14." (Emphasis added.) There was no request for the exhibit to be admitted as substantive evidence. Correspondingly, the objections raised by defense counsel were unrelated to any concern for whether texts could be used as substantive evidence or were limited to purposes of impeachment. The objections were, instead, based on lack of foundation, the presence of the explanatory note, and the fact the exhibit was not relevant because it did not depict "a tracing of the present case."

Because the Roaches did not seek admission of the tracings as substantive evidence, recognition of the learned treatise exception would not have aided them. Whether Illinois should adopt Federal Rule of Evidence 803(18) is therefore purely academic under the circumstances present here. Accordingly, the matter need not have been taken up by the appellate court, and it will not be taken up by us now.

The Roaches' second and final ground for reversal of the judgments in favor of Zinzilieta, Bradley and the Clinic is juror bias. The record shows that during *voir dire*, those waiting to be called as jurors were asked to

raise their hands if they or any close family members were patients of Dr. Zinzilieta or Dr. Bradley. Prospective juror Terrence McGlennon did not raise his hand. During the trial, McGlennon learned for the first time that his wife had been Dr. Zinzilieta's patient and would return to him if she had any future gynecological problems. In a sworn affidavit after trial, McGlennon stated: "When I learned about my wife being a patient of Dr. Zinzilieta I did not bring it to the court's attention as I did not think it significant." The Roaches contend that, under *Marcin v. Kipfer* (1983), 117 Ill. App. 3d 1065, McGlennon's relationship to Dr. Zinzilieta demonstrates bias *per se*, and that consequently a new trial must be granted. We disagree.

In *Marcin*, two prospective jurors were identified during *voir dire* as patients of the defendant doctor. The court denied plaintiff's challenge of the jurors for cause. On appeal, the court held that it was reversible error to refuse the challenge for cause, and remanded the cause for a new trial. In reaching its decision, the court focused upon the closeness of the relationship between the jurors and the defendant. As the court stated, the relationship between patient and doctor has traditionally been one of trust and confidence. A patient may be reluctant to find against his personal physician for fear of damaging the doctor's reputation. Given this, and considering the nature of the case, the court found that the jurors should have been discharged.

The *Marcin* court was careful to limit its holding, making it clear that only the very close relationship of the two jurors with their doctor required their exclusion. Recognizing that it would be difficult in some communities to find jurors who did not know a particular physician, the court stated that nothing in its decision should be taken to mean that others knowing the defendant doctor should be kept off the jury. (*Marcin*, 117 Ill. App.

3d at 1068.) The Roaches contend that the close doctor-patient relationship described in *Marcin* extends to the patient's spouse. Although such an argument might be made for some couples in some circumstances, we do not think the situation lends itself to blanket presumptions. In our view, the determination of whether a prospective juror can be fair and impartial when a spouse's doctor is a party must be assessed on a case-by-case basis.

The determination of impartiality is not purely objective; it is proper for the court to consider a statement of the juror as evidence of his state of mind. (*People v. Cole* (1973), 54 Ill. 2d 401, 414.) Here, juror McGlennon stated in his affidavit that he did not know until mid-trial that his wife was Dr. Zinzilieta's patient, and that when he became aware of the fact he did not think it "significant" enough to report. It is apparent from his statement that Terrence McGlennon, far from having a close personal doctor-patient relationship with Dr. Zinzilieta, did not even know for some time that he had any relationship at all. Upon learning of it, he clearly considered the relationship to be between only his wife and Dr. Zinzilieta. It is evident as well that McGlennon did not believe that his wife's relationship with her doctor would be injured should McGlennon find the defendant doctor liable for malpractice. Such a consideration, to McGlennon's mind, was not "significant."

Mere suspicion of bias or impartiality is not evidence and does not disqualify a juror. (*Cole*, 54 Ill. 2d at 415.) The burden of showing that the juror is biased or prejudiced is on the party challenging the juror. (*Cole*, 54 Ill. 2d at 413.) We are unwilling to extend the *Marcin* holding to the spouses of defendant doctors' patients, and we do not find that the Roaches have shown that McGlennon was biased in favor of Dr. Zinzilieta. Consequently, they have demonstrated no prejudice as a result of McGlennon's service on the jury.

For the foregoing reasons, the judgment of the appellate court is affirmed to the extent that it affirmed the judgment of the circuit court in favor of defendants Zinzilieta, Bradley and the Clinic. The judgments of the circuit and appellate courts in favor of Memorial are reversed, and the cause is remanded to the circuit court for a new trial on the Roaches' claims against that defendant alone.

*Appellate court affirmed in part
and reversed in part;
circuit court affirmed in part
and reversed in part;
cause remanded.*

CHIEF JUSTICE MILLER took no part in the consideration or decision of this case.