STATE OF NEBRASKA EX REL. AMISUB, INC. (SAINT JOSEPH HOSPITAL), RELATOR, V. HONORABLE JAMES A. BUCKLEY, JUDGE, RETIRED, DISTRICT COURT FOR DOUGLAS COUNTY, NEBRASKA, RESPONDENT.

618 N.W.2d 684

Filed October 27, 2000. No. S-99-1058.

Patrick G. Vipond, Raymond E. Walden, and Kyle Wallor, of Lamson, Dugan & Murray, for relator.

William J. Brennan, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., for amicus curiae George R. Collins.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## I. NATURE OF CASE

AMISUB, Inc., relator, also known as St. Joseph Hospital (AMISUB or the hospital) sought leave to file this original action seeking a writ of mandamus compelling the district court judge for Douglas County, the Honorable Lawrence J. Corrigan, respondent, since retired, to set aside certain orders compelling discovery, to quash certain discovery requests, and to enter a protective order prohibiting the discovery of certain documents in an action brought against AMISUB by George R. Collins, conservator of Elizabeth Collins (Elizabeth), a minor. During the course of these proceedings, Judge Corrigan retired and the Honorable James A. Buckley appeared and was substituted as respondent. The respondent is referred to as the "district court" in this opinion. We granted leave to file this original action.

Primarily at issue in this action is whether the documents in question are protected from discovery under the peer review privilege embodied in Neb. Rev. Stat. § 71-2048 (Reissue 1996). Related Neb. Rev. Stat. §§ 71-2046 and 71-2047 (Reissue 1996) are also involved in this action. Because we conclude that the documents at issue in the action are not privileged under § 71-2046 et seq., we now deny a peremptory writ of mandamus.

## II. STATEMENT OF FACTS

Following the grant of leave to file this original action, this court appointed, on October 14, 1999, the Honorable William D. Blue, a retired district court judge, as special master for the purpose of taking evidence and for making findings of fact. The factual statement of this case is taken largely from the findings of fact made by Judge Blue. Additional facts are taken from the pleadings and various exhibits.

AMISUB is the defendant in the case Collins v. AMISUB (Saint Joseph Hospital), Inc., docket 963, page 355, currently pending in Douglas County District Court (the underlying case). The underlying case was initiated by Collins as the conservator of Elizabeth to recover for injuries Elizabeth allegedly sustained when she fell as she was exiting her bed while a patient in the hospital's pediatric unit. Elizabeth's date of birth is April 3, 1978.

Elizabeth was involved in an automobile accident on July 24, 1995, and was brought to the hospital on that same date to receive treatment for injuries she sustained in the accident. She was initially treated in the hospital's intensive care unit (ICU), but on August 4, she was transferred from ICU to the hospital's pediatric ward. At the time she was transferred, Elizabeth's neurosurgeon, Dr. Charles Taylon, found Elizabeth to be alert and oriented. Dr. Raymond Heller, a medical resident who transferred Elizabeth from ICU to the pediatric ward, directed that Elizabeth could get out of bed and perform activities with "one assistant with her." He gave the order for assistance in order to "minimize the possibility of an accident happening."

On August 4, 1995, at 6 p.m., Elizabeth was taken by Susan Beaton, a registered nurse, to the restroom and then returned to her bed. The side rails on Elizabeth's bed were placed in the "up" position, and Elizabeth was given the nurse call light. Beaton testified that she informed Elizabeth she should not get out of bed without assistance.

Shortly after being returned to her bed, and while unattended, Elizabeth fell while exiting her bed. Beaton recorded the fall in Elizabeth's medical records as follows: "Afebrile. Unsteady on feet. [Patient fell] at 1800, climbed [out of bed] even [with] 4 siderails [up]. Report made. Dr. Heller called CT done, PT taken to surgery." The CT scan taken after she fell showed Elizabeth had a significant large right hemispheric subdural hematoma which was not present on a CT scan taken the day prior to her fall. The "report" to which reference is made by Beaton in Elizabeth's medical records quoted above is an incident or occurrence report prepared by Beaton on August 4, 1995 (incident report). This incident report is one of the documents for which AMISUB seeks a protective order.

At the time of her fall, Elizabeth was a minor. Collins filed the underlying case against AMISUB in his capacity as Elizabeth's conservator. In the second amended petition filed in the underlying case, Collins alleged that AMISUB's negligence was the proximate cause of Elizabeth's fall and subsequent injuries. In support of this allegation, Collins alleged that AMISUB was negligent as follows:

a. In failing to use the T.V. monitoring system when no one was in [Elizabeth's] hospital room.

b. In failing to provide adequate staffing to cover [Elizabeth's] needs.

c. In allowing [Elizabeth] to leave her bed without "one assist" in violation of the doctor's orders.

d. In leaving [Elizabeth] unattended both before and after the fall.

e. In failing to use appropriate equipment and/or alarm systems to warn [AMISUB] and its employees [that Elizabeth] was leaving her bed or prevent [Elizabeth] from leaving her bed.

f. In failing to monitor [Elizabeth's] medical chart on the day in question to determine that [Elizabeth] had a problem with memory.

Collins alleges in the second amended petition that as a result of Elizabeth's fall and the injuries she sustained from the fall, Elizabeth was forced to undergo the placement of a tracheostomy tube and laparoscopic gastrostomy tube, and suffered from elevated temperatures, swollen joints, and pneumonia. Collins further claims that at the time of Elizabeth's discharge from the hospital on August 31, 1995, she was in a semiconscious condition, unable to respond to verbal commands and unable to move her limbs. Collins alleges that Elizabeth required extensive rehabilitation as a result of the fall, is permanently disabled and unable to work, and has little or no future earning capacity. In the underlying case, Collins seeks from AMISUB, on behalf of Elizabeth, special damages in the amount of $85,000, together with general damages to compensate Elizabeth for her pain and suffering, loss of life's cares and joys, and lost income.

## 1. INCIDENT REPORT

On December 23, 1997, as part of the underlying case, Collins served AMISUB with certain requests for production of documents. Request No. 2 sought copies of all incident reports that had been referred to by Beaton in Elizabeth's August 4, 1995, medical records. AMISUB responded to Collins' discovery request by objecting to request No. 2, asserting that "any

incident reports or investigation made as part of any hospital utilization review or quality assurance assessment is privileged under Nebraska law." Thereafter, on April 9, 1998, and again on June 2, Collins filed a motion to compel production of the requested incident report. On June 8, AMISUB filed a motion for a protective order, requesting that the district court issue a protective order stating that this requested discovery would not be permitted.

AMISUB based its motion upon a claim of privilege pursuant to § 71-2046 et seq. These statutes were part of 1971 Neb. Laws, L.B. 148. The statutory provisions relate to the hospital-wide medical staff committee and hospital-wide utilization review committee and require all hospitals to establish such committees. See *Oviatt v. Archbishop Bergan Mercy Hospital*, 191 Neb. 224, 214 N.W.2d 490 (1974). Specifically, § 71-2046 provides as follows:

> Each hospital licensed in the State of Nebraska shall cause a medical staff committee and a utilization review committee to be formed and operated for the purpose of reviewing, from time to time, the medical and hospital care provided in such hospital and the use of such hospital facilities and for assisting individual physicians and surgeons practicing in such hospital and the administrators and nurses employed in the operation of such hospital in maintaining and providing a high standard of medical and hospital care and promoting the most efficient use of such hospital facilities.

Section 71-2047, part of L.B. 148, provides as follows:

> Any physician, surgeon, hospital administrator, nurse, technologist, and any other person engaged in work in or about a licensed hospital and having any information or knowledge relating to the medical and hospital care provided in such hospital or the efficient use of such hospital facilities shall be obligated, when requested by a hospital medical staff committee or a utilization review committee, to provide such committee with all of the facts or information possessed by such individual with reference to such care or use. Any person making a report or providing information to a hospital medical staff committee or a utiliza-

tion review committee of a hospital upon request of such committee has a privilege to refuse to disclose and to prevent any other person from disclosing the report or information so provided, except as provided in section 71-2048.

Section 71-2048, also part of L.B. 148, provides for a peer review privilege as follows:

The proceedings, minutes, records, and reports of any medical staff committee or utilization review committee as defined in section 71-2046, together with all communications originating in such committees are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless (1) the privilege is waived by the patient and (2) a court of record, after a hearing and for good cause arising from extraordinary circumstances being shown, orders the disclosure of such proceedings, minutes, records, reports, or communications. Nothing in sections 71-2046 to 71-2048 shall be construed as providing any privilege to hospital medical records kept with respect to any patient in the ordinary course of business of operating a hospital nor to any facts or information contained in such records nor shall sections 71-2046 to 71-2048 preclude or affect discovery of or production of evidence relating to hospitalization or treatment of any patient in the ordinary course of hospitalization of such patient.

The July 1, 1998, deposition of Dena Belfiore, the hospital's director of quality, was submitted by AMISUB in support of its motion for a protective order. According to Belfiore, the hospital did not have a committee known as the "utilization review committee." Belfiore testified, however, that the hospital had an analogous hospital-wide committee, the "quality committee," which committee was made up of 50 percent physicians and 50 percent hospital administrative staff. As the director of quality, Belfiore was a member of the hospital's "quality committee."

The incident report sought by Collins was prepared by Beaton the evening of August 4, 1995, following Elizabeth's fall. The incident report was filled out on a four-page form entitled "Patient Quality Assessment Report Quality Assessment & Improvement Review." The form includes spaces for the date

and time of the incident; the date of the report; the patient's status and gender; the hospital unit involved; a description of the incident and the medical equipment involved; a notation as to whether a physician was called as a result of the incident; the patient's medical condition before and after the incident; whether the incident involved a fall, medication, or blood; and the "Manager's" findings and recommendations. The incident report form has signature lines for the person providing the information on the form, the manager, the director, the person contacted, and a vice president, "when applicable." The specific incident report completed by Beaton was not signed by a "Person Contacted" or a vice president. There is a checkmark opposite an entry entitled "Standard of Care Met."

The last page of the form is captioned "To Be Completed by Review Committee." The last page has boxes to be checked for an "Analysis of Variances," as well as an evaluation of responsibility. The last page also has several lines which can be completed regarding recommendations and actions, along with boxes to be marked for followup. On the form completed by Beaton, these lines for recommendations and actions as well as the followup boxes are all blank. It is undisputed that the hospital's quality committee made no notations on the incident report.

According to Belfiore, as standard operating procedure, hospital nursing personnel were required to report "unusual and unexpected" events in incident reports. New employees are advised that this reporting practice is the structure under which nursing personnel are to operate. Belfiore further testified that the incident report prepared by Beaton was created and utilized for quality assurance purposes. Nevertheless, Belfiore testified that Beaton's incident report on Elizabeth's fall was not reviewed by the hospital's quality committee. According to Belfiore, incident reports were completed by hospital personnel, locked in a quality assurance file, and "never" reviewed by the hospital-wide quality committee. Instead, Belfiore testified that an "assessment" of an incident report might be made by the quality committee, and following such an assessment, an action plan might be developed to respond to the assessment. It is undisputed that no such assessment was made based on the incident report completed by Beaton with regard to Elizabeth's fall.

One of the exhibits entered into evidence before the special master is the deposition of Anita Larsen, the hospital's director of nursing, which deposition was taken on January 18, 1999. In her deposition, Larsen testified that an incident report, such as the one completed by Beaton, was an "internal communication tool" used to inform the "people in authority" of "what has happened." She further testified that Connie Mimick, the hospital's former risk manager, verbally explained to hospital employees that in completing incident reports, they should include "[t]he facts, just fill out the facts."

The parties also included in their exhibits before the special master the deposition of Beaton, also taken on January 18, 1999. Beaton testified, inter alia, that she noted in the incident report the results of a neurological examination she conducted on Elizabeth after the fall, which information was not included in Elizabeth's separate medical records.

In the underlying case, a hearing was held on June 15, 1998, and continued on August 19 on Collins' motion to compel and AMISUB's motion for a protective order. Thereafter, on November 19, the district court sustained Collins' motion to compel and ordered AMISUB to produce the requested incident report. AMISUB has complied with the district court's order and produced the incident report.

## 2. FALL LISTS

During the course of additional discovery in the underlying case, Collins learned that two registered nurses at the hospital, Dolores Gaeta and Sandra Slodkoski, had prepared lists of patient falls that had occurred in their respective departments. On March 22, 1999, Collins served upon AMISUB notices to take the depositions of these nurses. Included in the notices were requests that Gaeta and Slodkoski produce all records relating to falls at the hospital authored by them between 1990 and 1995.

Gaeta and Slodkoski were each deposed by Collins on March 30, 1999. At the start of the depositions, AMISUB's counsel stated that neither deponent would produce the documents requested by Collins. AMISUB's counsel claimed that the documents were privileged pursuant to § 71-2046 et seq.

On April 9, 1999, Collins filed a motion to compel seeking a court order compelling AMISUB to produce the two lists compiled by Gaeta and Slodkoski. On April 23, AMISUB responded to Collins' motion by filing a motion to quash and motion for a protective order, arguing that the lists were privileged pursuant to § 71-2046 et seq. In support of its motion, AMISUB offered the affidavit of Belfiore, dated May 12, 1999, which stated, inter alia, that the hospital "formed a number of quality improvement committees . . . in compliance with NEB. REV. STAT. § 71-2046." In Belfiore's affidavit, she further stated as follows:

4. The Quality and Utilization Review Department performs the review required by NEB. REV. STAT. § 71-2046. Pursuant to the standing policy directive of the Quality and Utilization Review Department, nurse managers and unit based quality assurance committees are required to identify those areas of patient care with potential for improvement.

5. The quality assurance information compiled by Sandra Slodkoski and Dolores Gaeta was performed in compliance with the standing directive of the Quality and Utilization Review Committee.

Belfiore did not attach to her affidavit a copy of the "standing policy directive" or the "standing directive" to which she refers in her affidavit. Belfiore did not further identify or explain either the "Quality and Utilization Review Department" or the "Quality and Utilization Review Committee" to which she referred in her affidavit.

In her deposition, Slodkoski testified that she was the hospital's nurse manager for the 4600 step-down telemetry unit. She testified that beginning in approximately 1992 and continuing into 1994, she compiled a list of information relating to patient falls in her unit. Her handwritten list consisted of the patient's name, the patient's room number, the time and date of the fall, and a description of the fall. Slodkoski testified that she derived the information for her list from hospital incident reports reciting factual events prior to their filing and that she compiled the information as part of her duty to oversee the quality of nursing in the 4600 unit. There is no evidence that Slodkoski is or is not a member of the hospital's quality committee.

Slodkoski testified that no one at the hospital requested that she prepare the list, that she kept the list in her own quality assurance book, and that no one at the hospital reviewed her list. She did state, however, that she would periodically review the information contained in the list with her own unit's quality committee, a unit-based quality committee consisting of Slodkoski, two or three staff nurses, and the hospital's director of nursing. Specifically, AMISUB produced no evidence that any hospital-wide committee, such as the hospital's quality committee identified by Belfiore in her July 1, 1998, deposition, requested, reviewed, or utilized the information in Slodkoski's fall list.

Gaeta testified in her deposition that she was the hospital's nurse manager for the 5100 step-down medical surgery unit. She stated that beginning in 1994 and continuing into 1996, she compiled a list of information relating to patient falls in her unit. There is no evidence that she was requested to prepare the list by the quality committee. Included in her list was the patient's name, the date and time of the fall, and a description of the fall. Gaeta further testified she might have included in her list a medical record number, so that she could index the information to a medical file. Like Slodkoski, Gaeta testified that she obtained the information for her fall list from hospital incident reports reciting factual events. She also testified that she prepared the list as part of her quality assurance duties and that she kept the list in her own personal quality assurance notebook. There is no evidence that Gaeta is or is not a member of the hospital's quality committee. Further, AMISUB produced no evidence that any hospital-wide medical staff or quality committee requested, reviewed, or utilized the information in Gaeta's fall list.

In the underlying case, on May 13, 1999, an evidentiary hearing was held on Collins' motion to compel and AMISUB's motion to quash and motion for a protective order, all relating to the discovery of the fall lists compiled by Gaeta and Slodkoski. By docket entry entered on June 3, 1999, the district court denied AMISUB's motion for a protective order and ordered that the fall lists be produced. According to AMISUB's brief, the fall lists have not yet been produced, and we note that no copy of either of the fall lists appears in the record.

On August 9, 1999, AMISUB filed with this court an application for leave to file an original action for a peremptory writ of mandamus, compelling the district court judge to vacate his orders entered on November 19, 1998, and June 3, 1999. On September 15, we granted AMISUB an alternative writ of mandamus, ordering the district court judge to vacate and set aside his order of November 19, 1998, which had sustained Collins' motion to compel discovery of the incident report and had overruled AMISUB's motion for a protective order, and his order of June 3, 1999, which had sustained Collins' motion to compel discovery of the fall lists and had overruled AMISUB's motion to quash and motion for a protective order, or to appear and show cause why a peremptory writ commanding the district court to do so should not issue.

Because Judge Corrigan retired from the bench, Judge Buckley, who was appointed to replace Judge Corrigan as the district court judge in the underlying case, responded to this court's September 15, 1999, order to show cause on September 22, stating that he had "again considered the issues raised by the motions resulting in [the] orders of November 19, 1998 and June 3, 1999 and reache[d] the same conclusion [as Judge Corrigan]." Thereafter, on October 14, this court appointed a special master to conduct an evidentiary hearing for the purpose of making findings of fact. The evidentiary hearing was held on November 29, and the special master received into evidence 39 exhibits. Thereafter, on January 11, 2000, the special master filed his findings of fact.

AMISUB, as the relator, has filed briefs in this mandamus action. Collins was granted leave by this court to file an amicus brief in this mandamus action. Judge Buckley waived notice or appearance at the evidentiary hearing before the special master and has not filed a brief with regard to the mandamus action before this court.

## III. ASSIGNMENTS OF ERROR

AMISUB claims the incident report and the fall lists are privileged records pursuant to § 71-2046 et seq. AMISUB thus contends that the district court erred in granting Collins' motions to compel the production of the incident report and the fall lists

608

and in not granting AMISUB's motions for protective orders with regard to the same documents and that this court should issue a peremptory writ of mandamus ordering the district court to set aside the orders of November 19, 1998, and June 3, 1999. AMISUB further argues that the district court erred in ordering the production of the fall lists because those lists contain personal information regarding hospital patients, none of whom are parties to the underlying case.

## IV. STANDARDS OF REVIEW

When construing the privileges set forth in § 71-2046 et seq., we are guided by the presumption that the Legislature intended a sensible, rather than an absurd, result in enacting the statutes. *Sheldon-Zimbelman v. Bryan Memorial Hosp.*, 258 Neb. 568, 604 N.W.2d 396 (2000); *Battle Creek State Bank v. Haake*, 255 Neb. 666, 587 N.W.2d 83 (1998). As a further aid to statutory interpretation, we must look to the statutes' purpose and give to the statutes a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. *Id.* It is well established that the components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *Sack v. State*, 259 Neb. 463, 610 N.W.2d 385 (2000).

## V. REQUIREMENTS FOR ISSUANCE OF WRIT OF MANDAMUS

Mandamus is an action at law and is an extraordinary remedy issued to compel performance of a purely ministerial act or duty imposed by law upon an inferior tribunal, corporation, board, or person, where (1) the relator has a clear legal right to the relief sought, (2) there is a corresponding clear duty existing on the part of the respondent to perform the act in question, and (3) there is no other plain and adequate remedy available in the ordinary course of the law. *State ex rel. Cherry v. Burns*, 258 Neb. 216, 602 N.W.2d 477 (1999); *State ex rel. City of Alma v. Furnas Cty. Farms*, 257 Neb. 189, 595 N.W.2d 551 (1999).

To warrant the issuance of a peremptory writ of mandamus to compel the performance of a legal duty to act, (1) the

duty must be imposed by law, (2) the duty must still exist at the time the writ is applied for, and (3) the duty must be clear. *State ex rel. Cherry v. Burns, supra*; *State ex rel. Tyler v. Douglas Cty. Dist. Ct.*, 254 Neb. 852, 580 N.W.2d 95 (1998). Mandamus is not available to control judicial discretion and will be issued only if there is an absolute duty to perform in a specified manner upon the existence of certain facts. *Id.*

In a mandamus action, the relator has the burden of proof and must show clearly and conclusively that it is entitled to the particular thing the relator asks and that the respondent is legally obligated to act. *State ex rel. Cherry v. Burns, supra*; *State ex rel. Acme Rug Cleaner v. Likes*, 256 Neb. 34, 588 N.W.2d 783 (1999).

## VI. ANALYSIS

### 1. MANDAMUS

Leave to file this original action seeking a writ of mandamus was granted on September 15, 1999. Leave was granted to permit this court to examine the scope of the privilege afforded under § 71-2046 et seq. This action involves primarily a statutory interpretation of § 71-2046 et seq. in the context of a discovery dispute. This court will issue a writ of mandamus upon a proper showing by the relator. *State ex rel. Acme Rug Cleaner v. Likes, supra.*

### 2. PRIVILEGED DOCUMENTS UNDER §§ 71-2047 AND 71-2048

In its briefs, AMISUB argues that the incident report and fall lists were prepared for quality review purposes generally and that in the case of the fall lists in particular, the information contained in the lists was actually reviewed by unit-based quality committees, as part of the unit committee's quality review process. AMISUB argues that because the incident report and the fall lists have been identified by the hospital as documents relating generally to quality review, the records are privileged under § 71-2048. AMISUB also suggests that the standing order to memorialize incidents extends a privilege under § 71-2047 to the documents at issue. On the basis of the undisputed record before us, however, we decline AMISUB's invitation to extend the privileges created under §§ 71-2047 and 71-2048 to either the incident report or the fall lists at issue in this action.

## (a) Burden of Proof and Scope of Privilege

In addressing AMISUB's claim in this mandamus action, we must determine which party bears the burden of proof with regard to a claim of privilege under § 71-2047 or § 71-2048. We have not previously decided this issue. In other cases involving a party's claim of a privilege, we have stated that the party asserting the existence of the privilege has the burden of proving that the documents sought are protected. See, generally, *Greenwalt v. Wal-Mart Stores*, 253 Neb. 32, 567 N.W.2d 560 (1997) (attorney-client privilege); *Branch v. Wilkinson*, 198 Neb. 649, 256 N.W.2d 307 (1977) (physician-patient privilege); *Castle v. Richards*, 169 Neb. 339, 99 N.W.2d 473 (1959) (attorney-client privilege).

In the instant action, AMISUB claims that it is entitled to a protective order denying Collins copies of the incident report and fall lists by virtue of the privileges set forth in § 71-2046 et seq. As in other instances involving the assertion of a privilege, we hold that AMISUB, the party claiming the privileges under §§ 71-2047 and 71-2048, has the burden of proving that the incident report and fall lists are protected documents under one of those statutes. We further observe that the privileges which AMISUB seeks to invoke are statutorily created under §§ 71-2047 and 71-2048, and we have held, and repeat as applicable here, that a statutorily created privilege will be narrowly construed. See, similarly, *Branch v. Wilkinson, supra* (statutory physician-patient privilege being in derogation of common law should be strictly construed).

With respect to the scope of the privileges at issue, we note that by its terms, § 71-2046 provides for the establishment of "a," or one, medical staff committee and "a," or one, utilization review committee, each of which reviews, inter alia, the care and facilities provided by the hospital. Nothing in the language of § 71-2046 contemplates the creation of multiple committees at a hospital department or unit level or the extension of the statutory privileges of §§ 71-2047 and 71-2048 to such departmental or unit-based committees. See, generally, 82 C.J.S. *Statutes* § 330 at 434 (1999) (words in statute "importing the singular only" will be applied to plural "only when it is necessary to do so in order to carry out the obvious intent of the legislature").

Thus, § 71-2046 provides that Nebraska hospitals will create one of each of the committees set forth in the statute to perform their functions on a hospital-wide basis. Reading § 71-2046 et seq. together, we determine that the privileges set forth in §§ 71-2047 and 71-2048 with respect to documents extend only to documents requested by such hospital-wide committees and further extend to the proceedings, minutes, records, and reports of such committees and to the communications originating in the hospital-wide medical staff committee and hospital-wide utilization review committee as defined in § 71-2046.

(b) Statutory Interpretation of § 71-2047
and Application to This Case

AMISUB suggests that the documents sought to be protected are privileged because they were prepared pursuant to a "standing directive" to memorialize incidents and were, therefore, "requested" under § 71-2047. We do not agree.

There is essentially no factual dispute in this case. The testimony is uncontradicted that the incident report was prepared as a result of a "standing directive" to memorialize the factual account of an unexpected occurrence and not upon the discrete request of a hospital-wide medical staff committee or hospital-wide utilization review committee. Further, there is no dispute that the fall lists were based on the factual accounts contained in various incident reports and were not requested by a hospital-wide committee.

Because the documents were not specifically requested by a hospital-wide medical staff committee or a hospital-wide utilization review committee, we conclude that the documents sought to be protected by AMISUB are not subject to the privilege outlined in § 71-2047. We further note, however, that even if the incident report and fall lists had been specifically requested by a hospital-wide committee, such documents would not have been privileged under § 71-2047, because reading §§ 71-2047 and 71-2048 together, these documents consist of merely "facts or information" which is not privileged from discovery under § 71-2048, which provides, inter alia:

Nothing in sections 71-2046 to 71-2048 shall be construed as providing any privilege to hospital medical records kept

with respect to any patient in the ordinary course of business of operating a hospital nor to any facts or information contained in such records nor shall sections 71-2046 to 71-2048 preclude or affect discovery of or production of evidence relating to hospitalization or treatment of any patient in the ordinary course of hospitalization of such patient.

See, also, *Columbia/HCA Healthcare v. Dist. Ct.*, 113 Nev. 521, 531, 936 P.2d 844, 850 (1997) (construing Nevada peer review privilege statute to exclude "[o]ccurrence reports," which hospital admitted were "nothing more than factual narratives," as such reports "contain the very type of information that will most likely be uncovered through traditional discovery procedures anyway"). We, thus, reject the suggestion of AMISUB that the documents sought to be protected are privileged under § 71-2047.

### (c) Statutory Interpretation of § 71-2048 and Application to This Case

Although the incident report and fall lists were not requested under § 71-2047 by a hospital-wide committee formed pursuant to § 71-2046, AMISUB contends nevertheless that these documents are privileged documents pursuant to § 71-2048 and, by virtue of that privilege, protected from discovery in the underlying case. AMISUB does not claim in its briefs that the incident report and the fall lists were actually reviewed by the hospital-wide quality committee, as that committee was identified by Belfiore in her deposition testimony. Indeed, there is no evidence that any hospital-wide committee, established pursuant to § 71-2046, requested, reviewed, or considered either the incident report or the fall lists. Nevertheless, AMISUB urges us to conclude that the privilege set forth in § 71-2048 extends to these documents because the documents are part of the hospital's overall quality review process. The issue thus presented is whether, under § 71-2048, the incident report and fall lists which are claimed to be generally related to the overall quality review process, should be deemed protected by the peer review privilege set forth in § 71-2048, which extends such protection to the "proceedings, minutes, records, and reports of any medi-

cal staff committee or utilization review committee as defined in section 71-2046" or communications which originate in such committees. For the reasons recited below, we conclude that the documents in question are not privileged under § 71-2048.

Although § 71-2048 was enacted in 1971, this court has only once previously considered the extent of the privilege set forth in the statute. In *Oviatt v. Archbishop Bergan Mercy Hospital*, 191 Neb. 224, 214 N.W.2d 490 (1974), a medical malpractice action, this court was asked to determine whether the proceedings, minutes, records, or reports of a medical staff committee were protected from discovery by virtue of § 71-2048. In concluding that the proceedings and records thereof were privileged in *Oviatt*, we discussed the policy behind the peer review privilege set forth in § 71-2048.

In *Oviatt*, we stated:

> The basis for the privilege extended to medical staff committees and utilization review committees is the public interest in the improvement of the care and treatment of hospital patients. . . . The importance of communication of information to the committees and full and open discussion in the committees during the review of clinical work can be easily seen.
>
> ". . . Candid and conscientious evaluation of clinical practices is a sine qua non of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations."

191 Neb. at 226, 214 N.W.2d at 492 (quoting *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970)).

In construing the breadth of the privilege created by § 71-2048 in *Oviatt*, we focused our attention on protecting the discussions and deliberations that occurred in the committees created under § 71-2046 and further noted the "importance of communication of information to the committees" for purposes of the committees' discussions and deliberations. 191 Neb. at 226, 214 N.W.2d at 492. With this focus in mind, we concluded that under § 71-2048, "the proceedings and records of the medical staff committee" at issue in *Oviatt* were privileged. 191 Neb. at 227, 214 N.W.2d at 492. Our decision in *Oviatt* is in

accord with the plain language of § 71-2048 which extends the privilege to "[t]he proceedings, minutes, records, and reports of any medical staff committee or utilizing revenue committee as defined in § 71-2046," together with all "communications originating in such committees."

Section 71-2048 was passed to protect deliberations within a hospital-wide committee which was required to be formed under § 71-2046. *Oviatt v. Archbishop Bergan Mercy Hospital, supra.* Section 71-2048 affords protection to the communications originating in and resulting from such a committee. However, as the plain language of § 71-2048 demonstrates, the purpose of § 71-2048 was not to preclude discovery of all hospital records. Section 71-2048 specifically provides that the peer review privilege found in § 71-2048 shall not be "construed as providing any privilege to hospital medical records kept with respect to any patient in the ordinary course of business of operating a hospital nor to any facts or information contained in such records . . . ." Reports which are merely factual accounts or fact compilations relating to the care of a specific patient are not privileged under § 71-2048. Such reports consist of "facts or information" and are not privileged under the plain language of § 71-2048. The language of § 71-2048 does not protect antecedent reports relating to the care of a specific patient which memorialize bare facts and which were written by or collected from percipient witnesses notwithstanding the fact that such documents may have been forwarded to a hospital-wide committee, nor does § 71-2048 protect an assembly of such facts outside the committees identified in § 71-2046. Matters occurring outside and documents found outside the deliberative process of a hospital-wide medical staff committee or a hospital-wide utilization review committee are neither "proceedings, minutes, records, and reports of" the committees nor "communications originating in such committees," § 71-2048, and are not protected from discovery.

Based upon the plain language of § 71-2048 and reading § 71-2048 sensibly in conjunction with § 71-2046, which requires the creation of hospital-wide committees, and further noting our decision in *Oviatt v. Archbishop Bergan Mercy Hospital*, 191 Neb. 224, 214 N.W.2d 490 (1974), it is clear that

the proceedings, minutes, records, and reports which are privileged communications under § 71-2048 are those communications which are part of the deliberations or communications of a hospital-wide medical staff committee or a hospital-wide utilization review committee or such communications which originate in such committees, as those committees are defined under § 71-2046, and when those hospital-wide committees are conducting the business authorized under § 71-2046 et seq. We conclude in this case that because the incident report and the fall lists were neither utilized by such hospital-wide committees nor originated in such hospital-wide committees created pursuant to § 71-2046, and because such documents contained merely "facts and information" relating to underlying incidents involving the care of specific hospitalized patients, the documents sought to be protected are not privileged under § 71-2048.

In concluding that the documents in question are not privileged under § 71-2048, we note that our reasoning is in accord with the rationale expressed in *Columbia/HCA Healthcare v. Dist. Ct.*, 113 Nev. 521, 936 P.2d 844 (1997), in which the Nevada Supreme Court examined the scope of Nevada's similar peer review privilege statute and refused to extend the privilege to cover occurrence reports. The Nevada court concluded such reports "are nothing more than factual narratives, contain[ing] the very type of information that will most likely be uncovered through traditional discovery procedures anyway." *Id.* at 531, 936 P.2d at 850. Comparable to the documents under consideration in *Columbia/HCA Healthcare*, in the instant case, the records which Collins seeks through discovery are records which contain facts and information regarding specific incidents involving the care of specific hospitalized patients. Although the fall lists are a compilation of information, the underlying information is derived from specific incident reports containing factual accounts of incidents recited therein. As the hospital's director of nursing, Larsen, testified, incident reports are made up of "just . . . the facts."

We recognized in *Oviatt* that the purpose behind § 71-2048 is to protect the discussions and deliberations of the committees required to be created under § 71-2046 which are involved in the quality review process. Construing § 71-2046 et seq. conjunc-

tively and giving these statutes a consistent, harmonious, and sensible construction, see *State v. Sack*, 259 Neb. 463, 610 N.W.2d 385 (2000), it is apparent that the improvement of the quality of patient care and treatment is to be achieved through the "review of clinical work," *Oviatt v. Archbishop Bergan Mercy Hospital, supra*, by hospital-wide committees situated to perform such review. The incident report and the fall lists are documents that relate to factually specific incidents involving the care of specific hospitalized patients, and none of the documents sought by Collins are purported to contain any information with regard to the hospital-wide quality review deliberative process to which the protection under § 71-2048 is directed.

Finally, we agree with the rationale expressed by the Illinois Supreme Court in *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 623 N.E.2d 246, 191 Ill. Dec. 1 (1993), in which the court looked to the purpose behind the Illinois peer review privilege and determined that the Illinois privilege was not intended to shield hospitals from all potential liability. The Illinois Supreme Court reasoned that if such an interpretation were adopted, "it would be substantially more difficult for patients to hold hospitals responsible for their wrongdoing through medical malpractice litigation. So protected, those institutions would have scant incentive for advancing the goal of improved patient care." *Id.* at 41-42, 623 N.E.2d at 251, 191 Ill. Dec. at 6. In other words, an overly broad interpretation of the privilege statute would defeat the very purpose of the privilege, the improvement of patient care. A statutorily created privilege is narrowly construed. See *Branch v. Wilkinson*, 198 Neb. 649, 256 N.W.2d 307 (1977). In the instant case, if we were to adopt AMISUB's proposal that all records and information, wherever generated and however utilized, which are characterized by a hospital as part of its overall generalized quality review process, are privileged under § 71-2048 and protected from discovery, such a statutory interpretation would effectively permit a hospital to insulate itself from the discovery of virtually all adverse documents and information other than the information immediately and actually contained in a patient's medical chart and records. Such a broad interpretation would defeat the Legislature's purpose in enacting § 71-2046 et seq., which is the improvement of patient care and

treatment. See *Oviatt v. Archbishop Bergan Mercy Hospital*, 191 Neb. 224, 214 N.W.2d 490 (1974).

AMISUB has presented no evidence that the incident report or the fall lists—all of which reflect factual accounts—were discussed or presented to either a hospital-wide medical staff committee or a hospital-wide utilization review committee as defined under § 71-2046. As noted in our analysis under § 71-2047, it is uncontroverted that the documents sought to be protected by AMISUB contain facts and information relating to underlying incidents involving the care of specific hospitalized patients and were not requested by a hospital-wide medical staff committee or a hospital-wide utilization review committee as defined under § 71-2046 and are not subject to a privilege under § 71-2047. Based upon this record, we decline to conclude under § 71-2048 that the incident report or the fall lists constituted either the "proceedings, minutes, records," or "reports of any medical staff committee or utilization review committee as defined in section 71-2046" nor, obviously, did the documents sought originate in such hospital-wide committees. Further, the documents in question contain "facts and information" relating to the care of specific hospitalized patients which are not privileged under § 71-2048. Accordingly, we conclude that AMISUB has failed to carry its burden of proving that the statutory privilege set forth in § 71-2048 protects the incident report prepared by Beaton or the fall lists compiled by Gaeta and Slodkoski from discovery. The district court did not err in refusing to grant AMISUB its requested protective orders and also did not err in ordering AMISUB to produce the incident report and the fall lists.

Because we conclude that AMISUB does not have a clear right to the relief it seeks and that the district court does not have a clear duty to perform the act AMISUB requests, mandamus is not appropriate.

### 3. REDACTING PERSONAL PATIENT INFORMATION FROM FALL LISTS

As an additional assignment of error, AMISUB contends the district court erred in requiring production of the fall lists because those lists contain personal information regarding hos-

pital patients, none of whom are parties to the underlying case. Presumably, by this assignment of error, AMISUB seeks some sort of a court order requiring that personal patient information be redacted from the fall lists before the lists are produced. We note, however, that outside an allusion to this issue in the briefs, there is nothing in the record to suggest that this request was first properly presented to the district court. This request first presented in this mandamus action will be disregarded inasmuch as the district court cannot have failed to perform an act which was not submitted to it for disposition. See, similarly, *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999). Although we do not address this issue in this mandamus action, we note that AMISUB is free to request such a protective order from the district court, which has discretion, pursuant to Neb. Ct. R. of Discovery 26(c) (rev. 2000), to structure a protective order to restrict the discovery of personal information belonging to hospital patients not parties to the underlying case.

## VII. CONCLUSION

For the reasons stated above, we conclude that the documents at issue in this action are not privileged under § 71-2046 et seq. and that a peremptory writ of mandamus directing the district court to enter an order protecting such documents is not an appropriate remedy. We, therefore, decline to issue a peremptory writ of mandamus.

PEREMPTORY WRIT DENIED.