# Illinois Official Reports

## Appellate Court

---

### *Davis v. Kewanee Hospital*, 2014 IL App (2d) 130304

---

| | |
|---|---|
| Appellate Court Caption | ALBERT R. DAVIS, Plaintiff-Appellant, v. KEWANEE HOSPITAL, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-13-0304 |
| Filed | February 25, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly dismissed plaintiff anesthesiologist's action seeking declaratory and injunctive relief based on defendant hospital's alleged violations of the Medical Studies Act and the Health Care Professional Credentials Data Collection Act, including the disclosure of information obtained during the credentialing process the hospital used in processing its offer of employment to plaintiff before that offer was withdrawn, since neither Act provided plaintiff with a private right of action for an alleged violation of the confidentiality exceptions in the Acts; however, plaintiff had the right to pursue common-law remedies. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 12-MR-1552; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas A. Zimmerman, Jr., Adam T. Tamburelli, and Frank J. Stretz, all of Zimmerman Law Offices, P.C., of Chicago, for appellant. |
|---|---|
| | John A. Simon and Arthur M. Scheller III, both of Drinker, Biddle & Reath LLP, of Chicago, for appellee. |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion. Justices Hudson and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Dr. Albert R. Davis, filed suit against defendant, Kewanee Hospital (the Hospital), seeking declaratory and injunctive relief based on alleged violations of section 8-2101 of the Code of Civil Procedure, commonly known as the Medical Studies Act (735 ILCS 5/8-2101 (West 2008)), and the Health Care Professional Credentials Data Collection Act (Credentials Act) (410 ILCS 517/15(h) (West 2008)). After the Hospital withdrew its offer of employment to Dr. Davis, Dr. Davis requested from the Hospital information related to its credentialing process. In particular, Dr. Davis sought information obtained by the Hospital during its process of assessing and validating his qualifications. The Hospital refused to provide the information, and Dr. Davis filed his complaint, seeking disclosure of the information. Dr. Davis alleged that exceptions to the confidentiality provisions in the Medical Studies Act and the Credentials Act required the Hospital to disclose the information. The Hospital moved to dismiss the complaint on the basis that neither of the confidentiality exceptions applied. The trial court agreed and granted the Hospital's motion to dismiss. Dr. Davis appeals, and we affirm.

¶ 2                              I. BACKGROUND

¶ 3    Dr. Davis was a licensed physician, surgeon, and anesthesiologist. In August 2008, he pursued a full-time position as an anesthesiologist at the Hospital. The Hospital's chief executive officer (Margaret Gustafson), its chief nursing officer (Jennifer Junis), and its medical staff assistant (Mary Schlindwein) expressed interest in employing Dr. Davis. On November 10, 2008, Gustafson extended to Dr. Davis an offer of employment that was contingent on credentialing by the Hospital.

¶ 4    In December 2008, the Hospital initiated its credentialing process and review of Dr. Davis's qualifications. On December 10, 2008, Schlindwein wrote Dr. Davis a letter thanking him for his completed "Request for Application Questionnaire" and enclosing further

documents for him to complete. The letter stated that, upon the Hospital's receipt of the completed documents, Dr. Davis's "credentials [would] be reviewed further." On December 16, 2008, Dr. Davis completed the Hospital's "Release of Liability and Practitioner's Statements," which authorized the Hospital to consult with anyone who had been associated with Dr. Davis, so the Hospital could obtain information bearing on his competence and qualifications. On December 18, 2008, the Hospital sent Dr. Davis an employment agreement.

¶ 5 Throughout January 2009, Dr. Davis, Gustafson, and Schlindwein engaged in e-mail and telephone conversations relating to his "ongoing credentialing process." The Hospital contacted Dr. Davis's professional references and received information from them. Then, on January 29, 2009, the Hospital withdrew its offer of employment.

¶ 6 Nearly three years later, on February 11, 2012, Dr. Davis wrote to the Hospital a letter requesting copies of all data from all sources used by the Hospital in reaching its decision to withdraw its employment offer. On March 16, 2012, the Hospital sent to Dr. Davis a letter advising him that neither the Hospital's "Medical Staff nor its Board of Trustees reached a conclusion" on his application for employment. The letter stated that Dr. Davis's application file had been "closed prior to the commencement of the credentialing review process."

¶ 7 Based on the Hospital's refusal to disclose the information, Dr. Davis filed a complaint against the Hospital on October 17, 2012. In his complaint, Dr. Davis alleged that the Hospital's decision to withdraw its employment offer was based on defamatory remarks made by one or more individuals employed by a hospital where Dr. Davis was previously employed. Dr. Davis alleged that the Hospital's refusal to disclose the information violated both the Credentials Act and the Medical Studies Act.

¶ 8 Counts I and II of Dr. Davis's complaint were premised on the Credentials Act. Count I sought a declaratory judgment that section 15(h) of the Credentials Act (410 ILCS 517/15(h) (West 2008)) required the Hospital to disclose all information obtained by the Hospital in its process of assessing and validating his qualifications. Dr. Davis alleged that he was prejudiced by the Hospital's refusal to disclose the information, because he believed that one of his prior employers was falsely disparaging him during the credentialing process at hospitals at which he subsequently applied for employment. Count II sought preliminary and permanent injunctions requiring the Hospital to disclose all information obtained during its process of assessing and validating Dr. Davis's qualifications. Dr. Davis alleged in count II that he lacked any other means to assert his disclosure rights under the Credentials Act.

¶ 9 Counts III and IV of Dr. Davis's complaint mirrored the above two counts but were premised on the Medical Studies Act. Count III sought a declaratory judgment that section 8-2101 of the Medical Studies Act (735 ILCS 5/8-2101 (West 2008)) required the Hospital to disclose the information, and count IV sought preliminary and permanent injunctions to that effect. In addition, Dr. Davis alleged that the Hospital had "actually reached a decision regarding" his application for employment.

¶ 10 On December 10, 2012, the Hospital moved to dismiss Dr. Davis's complaint under section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2012)). In its motion to dismiss, the Hospital explained its credentialing process as follows. Schlindwein would gather all of the applying physician's credentialing information and then

give the credentialing file to the Hospital's medical executive committee (MEC). The MEC would then review the information and make a recommendation to the Hospital's board of trustees on whether to accept or reject the physician's application. With respect to Dr. Davis, the Hospital had contacted his professional references in order to assess his competence and qualifications for membership on its medical staff. However, the MEC had not met on, reviewed, or considered Dr. Davis's credentialing information before the Hospital withdrew its employment offer.

¶ 11    Attached to the Hospital's motion to dismiss was Schlindwein's affidavit, dated December 6, 2012, which stated as follows. Schlindwein's duties included processing physicians' applications for medical staff membership and clinical privileges. Schlindwein was responsible for collecting credentialing information and then turning the credentialing file over to the MEC. On November 10, 2008, the Hospital extended to Dr. Davis an offer of employment that was subject to credentialing by the Hospital. During the process of collecting Dr. Davis's credentialing information, Schlindwein was informed that the Hospital had withdrawn its contingent offer of employment to Dr. Davis. At the time the Hospital withdrew the offer, the MEC had not met on, reviewed, or considered Dr. Davis's credentialing information or his application for employment. Therefore, the MEC had never made a decision regarding his application. In denying Dr. Davis's request for copies of all data used by the Hospital to reach a conclusion on his application, Schlindwein sent a letter advising Dr. Davis that the Hospital had never reached a decision on his application, because his file was closed prior to the commencement of the credentialing review process.

¶ 12    In its motion to dismiss the Hospital argued that its "credentialing file" was privileged under both the Medical Studies Act and the Credentials Act. In particular, under section 8-2101 of the Medical Studies Act, all information used by hospital committees "to decide upon a physician's staff privileges" was "strictly confidential." 735 ILCS 5/8-2101 (West 2008). The only exception to the rule of confidentiality, according to the Hospital, was that the "claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a *decision* was based." (Emphasis added.) *Id*. The Hospital argued that, because the MEC had not met on, reviewed, or considered Dr. Davis's credentialing information, or made a decision regarding his application for employment, the above exception did not apply to Dr. Davis.

¶ 13    In a similar vein, the Hospital argued that the Credentials Act also provided that all credentials data collected by a hospital was confidential. See 410 ILCS 517/15(h) (West 2008) ("Any credentials data collected or obtained by the *** hospital shall be confidential *** except that in any proceeding to challenge credentialing or recredentialing, or in any judicial review, the claim of confidentiality shall not be invoked to deny a health care professional *** access to or use of credentials data."). Again, the Hospital argued that the exception did not apply because the Hospital made no credentialing decision to challenge.

¶ 14    Dr. Davis filed a response to the Hospital's motion to dismiss, including a request for discovery pursuant to Illinois Supreme Court Rule 191(b) (eff. July 1, 2002). The discovery request sought leave to depose Schlindwein and obtain all documents pertaining to the Hospital's credentialing procedures and policies. To support his discovery request, Dr. Davis

attached his own affidavit, which stated that he believed that Schlindwein would testify regarding who informed her of the Hospital's decision to withdraw its employment offer and when she was informed. Dr. Davis also believed that Schlindwein would testify that the decision was based on defamatory remarks made by one or more individuals employed by a hospital where Dr. Davis was previously employed.

¶ 15 The Hospital filed a reply to Dr. Davis's request for discovery, including a supplemental affidavit by Schlindwein. In her supplemental affidavit, Schlindwein averred that she was processing Dr. Davis's credentialing information when she was instructed by Junis in February 2009 to stop work on his file, due to the Hospital's withdrawal of its employment offer. Schlindwein averred that she never gave Dr. Davis's credentialing file to the MEC or the board of trustees, because the file was not completed before his employment offer was withdrawn. Schlindwein further averred that she had sole custody of Dr. Davis's credentialing file at all times and had never disclosed any of its information to anyone.

¶ 16 A hearing was held on the Hospital's motion to dismiss. The Hospital argued that there was a difference between an employment decision and a credentialing decision. According to the Hospital, its decision not to employ Dr. Davis had nothing to do with the credentialing information it received. Based on Schlindwein's affidavit, no one but her had access to the credentialing file, meaning that there was no way it could have been used to make an employment decision. Dr. Davis responded that it was unclear whether the Hospital's employment decision was based on the credentialing information, which was why he wanted to depose Schlindwein.

¶ 17 The court granted the Hospital's motion to dismiss, reasoning as follows. The court agreed that there was a distinction between an employment decision and a credentialing decision. Because Schlindwein's affidavit made clear that no credentialing decision was ever made and that the credentialing process was still "going forth at the time that she was instructed to stop gathering information," the credentialing exceptions in the Medical Studies Act and the Credentials Act did not apply. In other words, Dr. Davis was not challenging a credentialing decision, because no such decision had been made by the Hospital. The court believed that the Medical Studies Act and the Credentials Act had to be read *in pari materia* and that public policy dictated that "if a credentialing process had not gone through to a decision, *** those materials submitted in that process [were] confidential under the terms of both of the acts as read together."

¶ 18 Dr. Davis timely appealed.

¶ 19                                      II. ANALYSIS

¶ 20 Dr. Davis appeals the dismissal of his complaint under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2012)). A section 2-619(a)(9) motion admits the legal sufficiency of the complaint but asserts some affirmative matter that avoids the legal effect of or defeats the claim. *Dewan v. Ford Motor Co.*, 363 Ill. App. 3d 365, 368 (2005). An affirmative matter is a type of defense that negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint. *Id*. We review a dismissal under section 2-619(a)(9) *de novo. Smith v. Waukegan*

*Park District*, 231 Ill. 2d 111, 115 (2008).

¶ 21                                    A. Medical Studies Act

¶ 22        Dr. Davis argues that the confidentiality exception in the Medical Studies Act applies in this case and therefore compels the Hospital to disclose its credentialing information. Section 8-2101 of the Medical Studies Act provides, in pertinent part:

> "All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs, including *** Credential Committees *** used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, *shall be privileged, strictly confidential* and shall be used only for medical research, increasing organ and tissue donation, *** or granting, limiting or revoking staff privileges or agreements for services, *except that* in any health maintenance organization proceeding to decide upon a physician's services *or any hospital or ambulatory surgical treatment center proceeding to decide upon a physician's staff privileges, or in any judicial review of either, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based.*" (Emphases added.) 735 ILCS 5/8-2101 (West 2008).

¶ 23        Dr. Davis does not dispute that under section 8-2101 the confidentiality exception is not triggered unless, following a credentialing process, a "decision" upon staff privileges is made. However, he points out that the Hospital, in claiming that its decision to withdraw its employment offer was not based on the information it received during the credentialing process, relied exclusively on Schlindwein's "self-serving" affidavits. The veracity of these affidavits, according to Dr. Davis, was never tested, because the trial court denied his Rule 191(b) request to depose Schlindwein. Thus, Dr. Davis argues, the court erred by denying his request to depose her. Dr. Davis also argues that the Hospital should not be allowed to insulate itself from the confidentiality exception by proffering an affidavit stating that its decision was based on something other than credentialing information without having to identify what that basis was.

¶ 24        The Hospital initially responds that the Medical Studies Act does not give Dr. Davis a private right of action for an alleged violation of its confidentiality exception. Because the Hospital raises this argument for the first time on appeal, Dr. Davis urges this court to deem it forfeited. However, the argument is not forfeited, because an appellee, as opposed to an appellant, may raise a defense for the first time on appeal so long as the facts upon which the defense is predicated are in the trial record. See *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 454 (2007) (although an appellant may not raise an issue for the first time on appeal, it is well settled that an appellee may raise a defense for the first time on appeal, as long as the factual basis appears in the record). The facts upon which

this defense is predicated are in the record. Accordingly, the Hospital's defense that Dr. Davis has no private right of action under the Medical Studies Act is not forfeited.

¶ 25 The Hospital's argument is premised on a recent case, *Tunca v. Painter*, 2012 IL App (1st) 110930, ¶ 19, in which the court held that the Medical Studies Act did not apply and also did not give a "peer reviewed physician" a private right of action for an alleged violation of its confidentiality provision.

¶ 26 In *Tunca*, the plaintiff surgeon filed a complaint against the defendant doctor, both employed at the same hospital, for allegedly violating the Medical Studies Act. *Id*. ¶ 4. The complaint was based on the defendant's statements to other doctors that the plaintiff had negligently performed a surgery. *Id*. The defendant's statements, according to the plaintiff, became widely disseminated and injured his professional reputation. *Id*. The plaintiff alleged that the defendant's statements constituted disclosure of privileged information, in violation of the Medical Studies Act. *Id*. The court rejected the plaintiff's argument because the Medical Studies Act did not protect against disclosure of information generated *outside of a peer review process* and, as the plaintiff conceded, the statements by the defendant were not made during a peer review process. *Id*. ¶¶ 13, 15. In other words, the hospital committee had to be engaged in the peer review process for the statutory privilege to apply, and because it was not, the confidentiality provision in the Medical Studies Act did not apply to the defendant's statements. *Id*. ¶¶ 15-16.

¶ 27 The *Tunca* court continued that, even assuming, *arguendo*, that the Medical Studies Act did apply in that case, the Medical Studies Act provided no private right of action for the plaintiff. Regarding an *express* right, the court noted that the Medical Studies Act contained "no language granting anyone a private right of action for a violation of its confidentiality provisions." *Id*. ¶ 19. Thus, there was no express right of action for an alleged violation of the Medical Studies Act.

¶ 28 The court then considered whether such a right could be *implied* under the Medical Studies Act, and it applied the relevant four-part test. *Id*. Under that test, implication of a private right of action is appropriate if: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute. *Id*. In applying this test, the court found that no implied private right of action existed. The court reasoned as follows.

¶ 29 First, the purpose of the Medical Studies Act was " 'to ensure that members of the medical profession [would] effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care.' " *Id*. ¶ 21 (quoting *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 40 (1993)). In addition, the Medical Studies Act served " 'to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease.' " *Id*. (quoting *Niven v. Siqueira*, 109 Ill. 2d 357, 366 (1985)). As a result, the class of persons that the Medical Studies Act was enacted to benefit was the general public, as opposed to physicians whose performance was under review. *Id*. Second, the injury it was designed to prevent was the increased rates of death and illness that

- 7 -

could occur in the absence of candid self-evaluation; the Medical Studies Act was not designed to prevent the loss of referrals that could result from the dissemination of information generated during a physician's peer review process. *Id.*

¶ 30 Third, the court recognized that, without the confidentiality provision of the Medical Studies Act, doctors could be reluctant to engage in strict peer review for fear of malpractice suits or the loss of referrals. *Id.* ¶ 22. Still, the main purpose of the Medical Studies Act was to provide better health care through candid self-evaluation, and any benefit that physicians derived from the confidentiality provision was incidental. *Id.* Finally, the court noted that the Medical Studies Act contained a provision making it unlawful to disclose privileged information (see 735 ILCS 5/8-2105 (West 2008)) and that the common law provided the plaintiff with a remedy in the form of a slander action. *Tunca*, 2012 IL App (1st) 110930, ¶ 22.

¶ 31 Dr. Davis responds that *Tunca* is distinguishable, that the above reasoning is *dicta*, and that application of the four-part test in this case gives him an implied private right of action. According to Dr. Davis, he is not seeking to keep information confidential, as was the situation in *Tunca*; rather, he seeks to enforce the confidentiality *exception* under the Medical Studies Act. Dr. Davis asserts that, whereas *Tunca* considered only the confidentiality provision when determining that the Medical Studies Act was enacted to benefit the general public, the exception shows that he is among the class of persons the Medical Studies Act was intended to benefit. According to Dr. Davis, the Medical Studies Act seeks to protect physicians from wrongful actions by hospitals during the credentialing process by providing that, when a physician challenges a hospital on this basis, the physician can obtain the credentialing information to ensure that the process was fair. Finally, Dr. Davis argues that the Medical Studies Act contains no remedy for a violation of its confidentiality exception. We disagree.

¶ 32 First, in arguing that he is a member of the class that the Medical Studies Act was intended to benefit, Dr. Davis focuses exclusively on the confidentiality exception and ignores the overall purpose of the statute. As illustrated in *Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455 (1999), such an approach is incorrect.

¶ 33 In *Fisher*, the plaintiffs, former employees of the defendant nursing home, sued for alleged retaliatory conduct, under section 3-608 of the Nursing Home Care Act (210 ILCS 45/3-608 (West 1996)). *Fisher*, 188 Ill. 2d at 456. The plaintiffs asserted that they had an implied private right of action by arguing that they were within the class that section 3-608 was designed to benefit and that their injuries were those that section 3-608 was designed to prevent. *Id.* at 462. In particular, the plaintiffs argued that section 3-608 prohibited retaliation by a nursing home against, *inter alia*, employees who reported abuse or neglect of a nursing home resident or who aided in the investigation of such a report. *Id.* The plaintiffs thus argued that section 3-608 was designed to protect nursing home employees, such as themselves, who had suffered retaliation by their employer as a result of aiding an investigation of their employer. *Id.*

¶ 34 The supreme court rejected that argument, noting that the plaintiffs had erroneously focused on a single provision of the Nursing Home Care Act, rather than looking at the statute as a whole. *Id.* at 462-63. The supreme court reasoned that the Nursing Home Care Act, when viewed as a whole, was not designed to protect nursing home employees from retaliatory conduct, despite the fact that section 3-608 prohibited retaliation against nursing home

employees who reported mistreatment of residents. *Id*. at 463. Indeed, the express language of section 3-608 revealed that it was not primarily concerned with protecting nursing home employees from retaliatory conduct by their employers, but rather sought "first and foremost to protect nursing home residents." *Id*. at 464.

¶ 35 In the case at bar, Dr. Davis similarly relies on a single provision, actually an exception within a single provision, to put him in the class of people the Medical Studies Act was intended to benefit. However, as in *Fisher*, the existence of the confidentiality exception does not alter the overall purpose of the Medical Studies Act. As *Tunca* correctly noted, the purpose of the Medical Studies Act is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care. *Tunca*, 2012 IL App (1st) 110930, ¶ 21. Consistent with this purpose, the *Tunca* court specifically rejected the plaintiff's argument that he was part of the class that the Medical Studies Act was enacted to benefit. *Id*. Rather, it is the general public who stands to gain from higher quality health care. *Id*. Though Dr. Davis tries to distinguish *Tunca*, the fact remains that he, like the plaintiff in *Tunca*, is not part of the class that the Medical Studies Act was enacted to benefit. The Medical Studies Act protects the general public, not doctors. Thus, the presence of the confidentiality exception does not elevate Dr. Davis into the class of people the Medical Studies Act was intended to benefit.

¶ 36 Second, the injury that the Medical Studies Act was designed to prevent is the increased rates of death and illness that could occur without candid self-evaluation, not the loss of referrals that could result from the dissemination of information generated during a physician's peer review process. *Id*. Therefore, the loss of an employment prospect for whatever reason, including a negative peer review, is not the type of injury that the Medical Studies Act was designed to prevent.

¶ 37 Third, a private right of action under the circumstances here is not consistent with the underlying purpose of the statute. The purpose of the Medical Studies Act is to ensure honest peer evaluation to advance the quality of health care for the general public, and confidentiality encourages such honesty. Giving Dr. Davis a private right of action pursuant to the confidentiality exception would have the opposite effect, deterring honest peer evaluation. See *Jenkins v. Wu*, 102 Ill. 2d 468, 480-81 (1984) (doctors seem to be reluctant to engage in strict peer review due to a number of apprehensions, including loss of referrals, respect, and friends, possible retaliations, vulnerability to torts, and fear of malpractice actions). Indeed, Dr. Davis's goal of identifying the individual or individuals who he believes have wrongly disparaged him would discourage the very information the statute is intended to promote. Reading the confidentiality exception to give an implied private right of action would swallow the protection afforded by the Medical Studies Act.

¶ 38 Fourth, our supreme court has found an implied private right of action under a statute only in cases where the statute would be ineffective, as a practical matter, unless such an action were implied. *Fisher*, 188 Ill. 2d at 464. This is not the situation here, as section 8-2105 of the Medical Studies Act provides that the improper disclosure of privileged information is punishable as a Class A misdemeanor (735 ILCS 5/8-2105 (West 2008)).

¶ 39 In arguing that the Medical Studies Act contains no remedy for a violation of its confidentiality exception, Dr. Davis again mistakenly assumes that he is a member of the class the statute was intended to benefit. See *Fisher*, 188 Ill. 2d at 464 (while encouragement of honesty and candor among the plaintiffs was certainly consistent with the underlying purpose of the Nursing Home Care Act, an implied private right of action for employees was not necessary in order to achieve that purpose, because the statute contained numerous mechanisms to encourage the reporting of violations). As the *Tunca* court noted, Dr. Davis may pursue a common-law remedy such as a slander action. See *Tunca*, 2012 IL App (1st) 110930, ¶ 22.

¶ 40 Finally, although Dr. Davis characterizes *Tunca*'s resolution as to an implied private right of action as *dicta*, such a distinction is meaningless because we are not bound to follow appellate court decisions outside of our district. See *Appelhans v. McFall*, 325 Ill. App. 3d 232, 239 (2001) (one district of the appellate court is not bound to follow the decisions of other districts, even though there may be compelling reasons to do so when addressing factually similar cases). For the reasons stated, we are persuaded by the analysis in *Tunca*. Thus, we determine that the Medical Studies Act does not give Dr. Davis an implied private right of action for an alleged violation of its confidentiality exception.

¶ 41 B. Credentials Act

¶ 42 Next, Dr. Davis argues that another confidentiality exception, that in section 15(h) of the Credentials Act, also requires the Hospital to disclose its credentialing information. Section 15(h) provides, in relevant part:

> "Any credentials data collected or obtained by the health care entity, health care plan, or hospital *shall be confidential*, as provided by law, and otherwise may not be redisclosed without written consent of the health care professional, *except that in any proceeding to challenge credentialing or recredentialing, or in any judicial review, the claim of confidentiality shall not be invoked to deny a health care professional, health care entity, health care plan, or hospital access to or use of credentials data.*" (Emphases added.) 410 ILCS 517/15(h) (West 2008).

¶ 43 Again, the Hospital responds that the Credentials Act does not give Dr. Davis a private right of action, either express or implied, for an alleged violation of its confidentiality exception. For the reasons previously stated, the Hospital's defense that the Credentials Act provides no private right of action is not forfeited.

¶ 44 There is no case law articulating the purpose of the Credentials Act, so we begin with a summary of the statute's provisions. See *Metzger v. DaRosa*, 209 Ill. 2d 30, 34-35 (2004) (in construing a statute, the primary objective of this court is to ascertain and give effect to the intent of the legislature, and the plain language of the statute is the best indicator of the legislature's intent). The Credentials Act provides for the establishment of a 13-member Health Care Credentials Council (410 ILCS 517/10 (West 2008)); the development and use of uniform health care and hospital credentials forms (410 ILCS 517/15 (West 2008)); a single credentialing cycle and a single site survey for the collection of credentials data of all health care professionals in a group (410 ILCS 517/20, 25 (West 2008)); a study by the Department of

Public Health and the Health Care Credentials Council of the need for coordinated credentials data verification (410 ILCS 517/30 (West 2008)); the adoption of rules by the Department of Public Health and the Health Care Credentials Council to enforce the above requirements (410 ILCS 517/35 (West 2008)); the enforcement of the statute's requirements by the Department of Public Health (410 ILCS 517/40 (West 2008)); and the adoption of the Illinois Administrative Procedure Act and the Administrative Review Law such that all final administrative decisions of the Department of Public Health are subject to judicial review (410 ILCS 517/45, 50 (West 2008)).

¶ 45 The Credentials Act requires that specific information be collected from health care professionals, including physicians, by hospitals, health care entities, and health care plans (collectively "health care entities") as part of the credentialing and recredentialing process. See 410 ILCS 517/5 *et seq.* (West 2008); 22 Robert John Kane *et al.*, Illinois Practice § 22:18 (3d ed. 2007). The Credentials Act defines "credentialing" as "the process of assessing and validating the qualifications of a health care professional." 410 ILCS 517/5 (West 2008). "Recredentialing" is "the process" by which a health care entity ensures that "a health care professional who is currently credentialed" by the health care entity "continues to meet the credentialing criteria" used by the health care entity "no more than once every 2 years." *Id*. "Credentials data" refers to "data, information, or answers to questions required by a health care entity, health care plan, or hospital to complete the credentialing or recredentialing of a health care professional." *Id*.

¶ 46 The Credentials Act streamlines the process of credentialing and recredentialing by requiring health care entities to use the "uniform" form created by the Department of Public Health and the Health Care Credentials Council. See 410 ILCS 517/15 (West 2008). The uniform form includes the credentials data commonly requested by health care entities and minimizes the need for the collection of additional credentials data. *Id*. The Credentials Act also requires health care professionals to provide any corrections, updates, and modifications to their credentials data to ensure that all credentials data remains current. *Id*.

¶ 47 The Credentials Act contains no express private right of action. Regarding an implied private right of action under the Credentials Act, we agree with the Hospital that none exists here.

¶ 48 First, Dr. Davis is not a member of the class for whose benefit the statute was enacted. In looking at the Credentials Act as a whole, we believe that its purpose is to standardize and regulate the collection of credentials data by health care entities during the credentialing and recredentialing processes. The adoption of a uniform form ensures accuracy, completeness, efficiency, and current information, which in turn ensures that health care entities correctly assess and validate the qualifications of health care professionals. Like the Medical Studies Act, the Credentials Act provides that credentials data is confidential. Making this information confidential further ensures its accuracy through honest peer review. By isolating the confidentiality exception, Dr. Davis repeats the mistake of ignoring the overall purpose of the statute. The purpose of the statute is to standardize and regulate the collection of credentials data to ensure that health care entities correctly assess and validate health care professionals' qualifications. The correct assessment and validation of health care professionals'

qualifications benefits the general public, as opposed to physicians, by ensuring that only qualified health care professionals treat patients. *Cf. Metzger*, 209 Ill. 2d at 38 (the Personnel Code (20 ILCS 415/19c.1 (West 2002)) was designed primarily to benefit the general public by ensuring competent employees for government bodies). Therefore, Dr. Davis is not among the class for whose benefit the Credentials Act was enacted.

¶ 49    Second, the injury that the Credentials Act was designed to prevent is the incorrect assessment and validation of a health care professional's qualifications. It is impossible to accurately assess and validate a health care professional's qualifications if the data collected is inaccurate, incomplete, or not up to date. The obvious risk is the credentialing and recredentialing of unqualified health care professionals, which would affect the quality of health care that patients receive. By regulating and standardizing the credentialing and recredentialing processes, the Credentials Act was designed to prevent this sort of injury. Contrary to Dr. Davis's assertion, the statute was not designed to allow access to confidential credentials data or prevent the injury of the loss of an employment offer.

¶ 50    Third, a private right of action under the circumstances here is not consistent with the underlying purpose of the Credentials Act. As stated, the purpose of the statute is to standardize and regulate the collection of credentials data to ensure that health care entities correctly assess and validate health care professionals' qualifications. Honest peer evaluation is critical to the collection of accurate credentials data, and giving Dr. Davis access to such confidential information would deter honesty and run counter to the purpose of the statute.

¶ 51    Fourth, there is no need to imply a private right of action to remedy a violation of the Credentials Act, because the statute provides a comprehensive enforcement scheme. The Credentials Act expressly gives the Department of Public Health the authority to enforce its provisions. See 410 ILCS 517/40 (West 2008) ("In addition to any other penalty provided by law, any health care entity, health care plan, hospital, or health care professional that violates any Section of this Act shall forfeit and pay to the Department a fine in an amount determined by the Department of not more than $1,000 for the first offense and not more than $5,000 for each subsequent offense."). To this end, the Department of Public Health has promulgated rules enforcing the Credentials Act. See 77 Ill. Adm. Code 965.210 (2008) (filing of complaints under the Credentials Act); 77 Ill. Adm. Code 965.230 (2008) (determining whether the Department of Public Health should take adverse action).

¶ 52    In addition, the Credentials Act adopts both the Administrative Procedure Act and the Administrative Review Law. See 410 ILCS 517/45, 50 (West 2008). "Where the statute creating or conferring power on an administrative agency expressly adopts the Administrative Review Law, a circuit court has no authority to entertain an independent action." *Metzger*, 209 Ill. 2d at 42. As in *Metzger*, where the Personnel Code similarly provided that the Administrative Review Law was applicable, the legislature has demonstrated its intent not to imply a private right of action to enforce the Credentials Act. See *id.* at 43 (in providing that the Administrative Review Law was applicable to the Personnel Code, the legislature had demonstrated its intent that no private right of action existed). Further, as noted above, Dr. Davis may pursue a common-law remedy.

¶ 53                                   III. CONCLUSION

¶ 54        For the reasons stated, Dr. Davis has no private right of action for alleged violations of the confidentiality exception under either the Medical Studies Act or the Credentials Act. The judgment of the Du Page County circuit court is affirmed.

¶ 55        Affirmed.